Wanamaker, J.
The pertinent facts are few, and generally conceded. On the 22d of September, 1919, the city of Youngstown had within its borders a steel strike, as it was commonly known. Biot, disorder and bloodshed had already appeared, and were daily threatening to extend a reign of anarchy and ter-' ror over the city and its industries.
The situation was shown at the time of the trial of this cause in the court of common pleas by the amended answer:
*566 “Defendant further admits that at and during the times as alleged in plaintiff’s first oause of action an emergency existed in said city of Youngstown necessitating the appointment of additional patrolmen.
“Defendant further admits that pursuant to authority conferred upon him by the statutes of the State of Ohio, the Mayor of the City of Youngstown did, at the time of commencement and during the times in plaintiff’s first cause of action, alleged, appoint additional patrolmen for temporary service for whose wages as emergency patrolmen plaintiff’s first cause of action is brought.
“Defendant further admits that subsequent to suoh appointment that the said emergency patrolmen did render to this defendant, the City of Youngstown, services as such emergency patrolmen.”
The following admission appears in the record:
“It is agreed by the parties hereto that an emergency existed requiring the appointment of the policemen that were appointed.”
Arid again, the condition existing is shown by the remark of Mr. Leighninger, city solicitor,:
“It is admitted there was sufficient emergency to bring the appointment of the patrolmen in question within the provisions of the statute.”
The statute under which the mayor proceeded to appoint the emergency patrolmen (Section 4373, General Code) is as follows:
“In case of riot or other like emergency, the mayor may appoint additional patrolmen and officers for temporary service, who need not be in the classified list of such department. Such additional *567 officers or patrolmen shall he employed only for the time during which the emergency exists.”
No question is made that the emergency patrolmen were employed longer than the time during which the emergency existed.
The record shows that during the time of the emergency and the employment of such patrolmen the city of Youngstown was without money in its treasury to pay the patrolmen, and that its officials knew of no way of securing the money to meet the payments for such employment.
The record shows that the mayor and other city officials conferred with one Mr. Adams, president of the First National Bank of Youngstown, the defendant in error, in regard to advancing the money necessary to pay the emergency patrolmen at the regular periods the regular wage that usual and ordinary patrolmen were paid, to-wit, 62y2 cents per hour.
The result of those negotiations between the bank and the mayor was in substance as follows:
That the mayor, so far as his authority under the law permitted, would obligate the city, so far as he had power so to do. This fairly appears from the record, a part of which is as follows:
“Q. What did you say to him with reference to the city paying it back if it had the legal power to do .so? [The mayor on the witness stand.] A. I told him they undoubtedly would pay it back if there was any legal manner in which the same could be done.
“Q. What did Mr. Adams say in reference to that statement? A. Well, he said they would furnish the money.
*568 ‘ ‘ Q. Furnish the money to these men as the debts accrued? A. I afterwards told him, ‘now Adams I am not going to talk any more to you about the fund. These emergency patrolmen are on duty and I want their money in the bank and when the check is drawn for their pay I want them to get their money. These men won’t work unless the money is there. We can pay them every two weeks and if you see that the money is in the bank I think we will maintain law and order.’ ”
Pursuant to the arrangement, the city auditor from time to time furnished the bank a payroll containing the names of the emergency patrolmen and the amounts due them, and the bank paid the money out upon that payroll to the several emergency patrolmen.
The first question naturally arising is as to the mayor’s duties and powers in the premises. It is agreed by both sides that the first general section applicable is Section 4250, General Code:
“The mayor shall be the chief conservator of peace within the corporation.”
Clearly this provision of law concisely imposed a duty upon the mayor, as the conservator and preserver of peace within the corporation, a peace that was then seriously jeopardized, which jeopardy would be increased if any indifference or hesitation was shown by the mayor. The duty imposed by that section must be equalled by the power given, expressly or impliedly, to preserve that peace.
This general provision declaring a general duty involving a general power must clearly and convincingly grant sufficient general power for the mayor to accomplish and perform the duty imposed. What *569 ever power would be proper and pertinent to the discharge of that duty under that statute would be available to the mayor as the servant or agent of the corporation, and would likewise be obligatory upon him as such agent, and upon his principal, the city, so far as the reasonable performance of his duty required.' This would be the undoubted rule of law in the absence of any special provisions..
It is conceded, however, that there is a special provision of law dealing with the emergency situation presented in this case, and that is Section 4373, General Code, under which the mayor proceeded, as shown by the record:
“In case of riot or other like emergency, the mayor may -appoint additional patrolmen and officers for temporary service, who need not be in the classified list of such department. Such additional officers or patrolmen shall be employed only for the time during which the emergency exists.”
The emergency being admitted, and the patrolmen being appointed pursuant thereto, it follows in the language of the statute as supported by the record that the emergency patrolmen were employed “for the time during which the emergency exists.”
What is the meaning of the word “employed” as used in the statute ? Employed is an ordinary word, used in the ordinary sense, in connection with work and labor performed for others. When one employs another in some work or service, it is the common ordinary understanding that there shall be a resulting or reciprocal compensation for such work and service rendered by such employe. It is an old saying that “The laborer is worthy of his hire.” It matters not Whether he be a private laborer or a *570 public laborer. Good conscience recognizes the truth and soundness of this proposition. Ordinarily the employer and employe fix the compensation in advance. Where they fail so to do, the law fixes it, after the work and service are rendered, at the fair and reasonable worth of such work or service. In short, the word “employ,” as ordinarily used among men in the private and public affairs of life, carries with it the primary idea of compensation. A man’s time or work is his property, and when the public takes it and uses it, there is at least an implied obligation to pay its fair and reasonable value; else you have the taking of property without due process of law. This presumption of course is rebut-table, and it may be shown that there was to be no compensation.
We hold that under Sections 4250 and 4373, General Code, the city duly employed the emergency patrolmen, and became obligated to them for a fair and reasonable compensation for their time and service rendered the city in the performance of the duties imposed upon them, under and by virtue of the above sections and the situation confronting the city of Youngstown.
The next question is: Did the bank, by advancing the money for the city, and mailing the payments to the emergency patrolmen in the situation shown by the record, become subrogated to the rights of the emergency patrolmen, so as to enable it to maintain the action in question?
In order that the bank may be entitled to the right of subrogation it must first appear that the emergency patrolmen would have been entitled to sue the city to recover from the city in the amount of the *571 several sums paid them by the bank. It is admitted by both sides to this controversy that there was a moral obligation to pay the patrolmen, but the city strongly urges that there was no legal obligation by virtue of the Bums Law, so-called (Section 3806, General Code), which law is now in force.
So far as pertinent, this law reads:
“No contract, agreement or other obligation involving the expenditure of money shall be entered into, nor shall any ordinance, resolution or order for the expenditure of money, be passed by the council or by any board or officer of a municipal corporation, unless the auditor or clerk thereof, first certifies to council or to the proper board, as the ease may be, that the money required for such contract, agreement or other obligation, or to pay such appropriation or expenditure, is in the treasury to the credit of the fund from which it is to be drawn, and not appropriated for any other purpose, which certificate shall be filed and immediately recorded.”
The Burns Law, in our judgment, is one of the most wholesome laws of a restrictive nature ever put upon the statute books, and its spirit and letter should be scrupulously respected and followed. Clearly, however, it was designed to apply to the usual, ordinary, and everyday transactions between the public and the city, through its officers. In its strict literal interpretation it would clearly comprehend the election of a public officer, which now involves the obligation to pay the salary of such officer upon his official service, for which the money may or may not be in the treasury, unappropriated. But we never heard it claimed that the statute was *572 ever intended to cover any such obligation as that arising from.an official salary.
In its last analysis, that is the very subject-matter involved here. A police officer or emergency patrolman, by whatever name he may be designated, is a peace officer serving the city. By parity of reason such appointive officer was never contemplated within the letter and spirit of the law, any more than the elective officer.
But there is another and greater reason why this statute does not apply to the present case. Here was an emergency situation pregnant with all kinds of municipal danger, even from dynamite, which should it become uncontrollable might disorganize and destroy the corporate government itself, the safety of its society and the security of its property. Like a storm in the night season it broke swiftly and suddenly upon the city unprepared to meet the situation; a real emergency had arisen which called for all available resources of the city to control it.
Such exigencies could not have been contemplated by this statute and were therefore never comprehended within its terms. Such a situation was comprehended by the particular statute heretofore cited, Section 4373, General Code, and that statute for such temporary period, to-wit, the time during which the emergency existed, must of necessity supersede the regular and usual order contemplated in the Bums Law.
We hold, therefore, that in this case, the Burns Law cannot, and therefore does not, apply. We hold in good conscience that the bank has been subrogated to the rights of the emergency patrolmen, and should recover from the city the amount so paid, *573 limited to an amount that is fair and reasonable, as to which amount both sides are agreed.
It seems that there has been some confusion of thought by reason of the strictness with which municipal power has heretofore been construed and applied. It will be profitable to return to some of the old landmarks of the law. Some things in law and government have been regarded as self-evident. The American fathers, nearly a century and a half ago, declared: “We hold these truths to be self-evident, that all men * * * are endowed by their Creator with certain unalienable rights, that among these are life, liberty and the pursuit of happiness; that to secure these rights, governments are instituted among men,” etc. Not merely some governments, but all governments, whether styled federal, state, or municipal; the right to life upon the part of the individual is no less when he becomes a member of a community than it was prior to such community life; nor is it any the less when that community is incorporated into a municipality. The law has long recognized that right in the form of the right of self-defense, which may involve the taking of life, justifiably and lawfully. Is that right of self-defense any the less to a municipality than it is to an individual?
Surely, if there be any virtue in numbers, the right should be greater where large numbers are involved, than where the individual alone is involved. Our Democracy was bom in community life. That community life took its first political form in some public corporation, and one of the earliest forms was a municipality. We often forget that we had municipalities before we had nations and before we had states. Hence, the municipality originally did *574 not derive its political power, especially the power to maintain and define itself, from the state, because there was no state in existence.
To those who may desire a precedent to support this proposition, I refer to the statement of this doctrine by that great jurist, Judge Thurman, in an early Ohio case, Cass v. Dillon, 2 Ohio St., 607, at page 622:
“The constitution did not create the municipalities of the state, nor does it attempt to enumerate their powers. It recognizes them as things already in being, with powers that will continue to exist, so far as they are consistent with the organic law, until modified or repealed. Thus there is no express provision that a county may make a road or contract a debt, yet no one will doubt for a moment that it may do both. Indeed, its power to contract debt is recognized, beyond even the authority conferred by law. It is clearly assumed in section 5 of article 8, that it may create debts to -repel invasion, suppress insurrection, or defend the state in war, although no such power has ever been conferred by statute, so far as I can discover. If it can thus incur debts, it may, of course, levy taxes to pay them; notwithstanding its only express grant of the taxing power is, by section 7 of article 10, for 'police purposes.’ The same thing may be said of townships, cities, towns, and villages.”
When the people of a community organize themselves into a municipality, a public corporation, the artificial political entity created is entitled to protection’ against violent assault, and just as Judge Thurman says may create debts to suppress insurrection, whether it be called a mob, a riot, or any *575 other naine signifying the usé of violence, organized or unorganized, which threatens and jeopardizes the very life of the municipality.
Common sense, common justice, the common conscience of our' courts, no less than our common people, demand that the full resources of our municipalities and our states shall he employed, yes, if necessary exhausted, that law and order may he maintained; in order that the unalienable rights of men, women and children shall be safe and secure.
This view of the case is further reinforced by the enlargement of municipal powers granted in Article XVIII of the Ohio Constitution, as adopted in 1912, particularly Section 3, which vests in the. municipality “all powers of local self-government.”
It would be a strained and unnatural construction to hold that such a broad, comprehensive grant of power did not include the power of self-defense, the power of protecting human life, human liberty, and human property.
But it may still be urged that there is no express grant of power to pay for the service. In no case has the subject of implied powers been more ably and fully discussed than in the old case of McCulloch v. Maryland, 4 Wheat., 316, in which the great jurist John Marshall speaks for the supreme court of- the United States.
The same doctrine that he there applied to implied powers pertaining to the nation should be applied to implied powers of the municipality. The power and duty to perform, clearly implies the power and duty to pay the fair and reasonable expense of that performance, particularly when the acts per *576 formed are vital and necessary to the safety of society itself.
Under the new Constitution of 1912, the powers heretofore granted by statutes have not grown less, but, on the contrary, greater and more effectual in local self-government.
The emergencies presented by national war, where the ordinary laws and constitutions pertaining to peace are for the time suspended in order to defend the nation, are quite parallel to those of a municipal war, a mob, or a riot, threatening municipal order and government, a civil insurrection that endangers the very life of municipal government. Our laws and constitutions must yield to necessity in their construction and application to the emergencies presented, or government must surrender to anarchy.
The judgment of the court of appeals is affirmed as to the first cause of action and reversed as to the second cause of action, and the cause is remanded to the court of common pleas for such other and further proceedings as are required by law.

Judgment accordingly.

Marshall, C. J., Hough, Robinson, Jones, Matthias and Clark, JJ., concur.